UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:12-00110-01

RONALD SCOTT DAILEY


MEMORANDUM OPINION AND ORDER


Pending is the defendant Ronald Scott Dailey's motion to dismiss ("second motion to dismiss") filed March 12, 2013.[1]


I.


On June 24, 2009, Mr. Dailey was convicted in the Washington County Vermont Superior Court of engaging in lewd and lascivious conduct in violation of 13 Vermont Statutes Annotated section 2601.  An affidavit earlier filed in this action, which

---

[1]   The court has today transmitted to the Clerk for filing two letters.  The letters were sent to the court by the Assistant Federal Public Defender originally assigned to represent the defendant but who left his employing office on September 21, 2012.  Both letters were copied to the assigned Assistant United States Attorney and the defendant personally.  The first letter is dated August 29, 2012.  The second letter is dated September 19, 2012.  It is ORDERED that the Clerk be, and hereby is, directed to file both letters as a part of the official record of this proceeding.

appears to have been drawn by, or for, a law enforcement officer

named Cheryl Goslant, provides pertinently as follows:

> On 05-04-00 the Montpelier Police Department received
> a report from a couple of students at the Union 32
> Alternative Education Program . . . .  The report was
> regarding a lewd act that was observed by a couple of
> students in the parking lot behind the school.

> Juvenile #1 gave the following statement: "This
> morning of 5-4-00 [name redacted in original] had
> brought her sister to school and I . . . was with her,
> because she picks me up for school every morning. . .
> . We passed Cumberland Farms and saw a white van
> there.  When we got to our school 5 minutes later the
> white van showed up and parked in front of us.  The
> guy in the van went in the back and then came a little
> between the seats up front.  The guy then exposed
> himself masturbating with an irrection [sic] and the
> hand going back and forth. . . . This guy is here at
> our school just about every morning for the past two
> or three weeks."

(Ex. 1. at 1).  The affiant then recounted a similar version

provided by the apparent second victim, who was accompanying

Juvenile 1:

> [Name redacted in original] . . . gave the following
> statement: "This morning I brought my sister to school
> . . . and I was with my friend [name redacted in
> original].  [W]e drove by Cumberland Farms and the guy
> with the white van that seems to be following me
> around [w]as there.  Then [name redacted in original]
> and I came to school, it was 7:10 am about 5 minutes
> after this van pulled up in front of me and he went in
> back . . . .  I could see that he was getting
> undressed and that his shirt [was] unbuttoned and came
> up front and sat in his seat for a couple minutes, and
> then he stood up and went back toward the front two
> seat[s], turned facing me and [name redacted in
> original].  Then he kept looking at us and he had an
> irrection [sic] and started masturbating in front of
> the both of us. . . . I was so scar[e]d that I could
> not even start my Bronco or beep the horn to my

> teacher and I could not even do that. . . . He is here
> almost about every morning for the past two weeks and
> he also did the same thing 2 weeks [ago] and I was too
> scared to do anything about it.

**(Ex. 1. at 1-2).**

On June 24, 2009, Mr. Dailey appeared before the Honorable Brian J. Grearson, Vermont Superior Court Judge, to enter a plea of guilty to the section 2601 offense and receive his sentence.  The colloquy of the plea hearing includes the following exchange between Judge Grearson and Mr. Dailey:

> THE COURT:  And the affidavit, I know it's an old one,
> Mr. Dailey.  Have you had a chance to review that with
> Mr. Sheftman since you've been in custody?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  And are the facts in there substantially
> accurate as to this offense and your involvement in
> it?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  The claim of masturbation while in your
> van in front of a couple young ladies?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Those facts are accurate?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT:  Your plea to this offense, Mr. Daily,
> guilty or not guilty?
>
> THE DEFENDANT: Guilty.

(Govt.'s Resp. to Supp. Mem., Ex. 2 at 189).  A suspended term was imposed and Mr. Dailey was placed on probation.

3

At some point between September 1 and November 30, 2009, Mr. Dailey moved to, and resided at or in, the vicinity of Charleston, West Virginia.  He failed to record with the West Virginia State Police that identifying information required by the West Virginia Sex Offender Registry ("WVSOR"), a listing maintained in compliance with the Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. § 16901 et seq.

On May 2, 2012, a federal grand jury in this district returned an indictment alleging, inter alia, the following:

> Subsequent to his travel to West Virginia, defendant . . . was required to update his sex offender registration under . . . [SORNA] because he was and is a sex offender as defined for purposes of the Act.

> From on or about November 30, 2009, through on or about December 13, 2011, at or near Charleston, Kanawha County, West Virginia, and within the Southern District of West Virginia, defendant . . . did knowingly fail to update his registration as required by the Act.

> In violation of Title 18, United States Code, Section 2250.

(Indict. at 1-2).

Five days after the indictment, on May 7, 2012, Mr. Dailey's 2009 Vermont probation term was revoked.  He contends that he was sentenced to a one- to five-year term of incarceration. (See Memo. in Supp. at 1).  He pled guilty in Vermont that same day for failing to register as a sex offender

in violation of 13 Vermont Statutes Annotated section 5407.  He was sentenced on that separate charge to an additional term of imprisonment of up to one year, which would run concurrent with the probation revocation sentence.

On or about May 9, 2012, the United States Attorney in this district sent by facsimile to Mr. Dailey's correctional institution, the Northeast Regional Correctional Facility ("NERCF") in Vermont, a Detainer Against a Sentenced Prisoner ("Detainer").  The Detainer provided, in part, as follows:

> Pursuant to the provisions of the . . . [Interstate Agreement on Detainers Act, 18 U.S.C.A. App. 2 ("IADA")], a person serving a sentence of imprisonment in any penal institution against whom a Detainer is lodged (based on pending Federal criminal charges which have not yet been tried) must be advised that a Detainer has been filed and that the prisoner has the right to demand speedy trial on those charges. Accordingly, please advise the subject that a Detainer has been filed against him/her and that under the IADA, he/she has the right to demand speedy trial on the charges. If your office does not have an official form for such purposes, the statements contained in this Form below may be used.

(Ex. 1, Govt.'s Resp. at 1).  The court sets forth below the entirety of the referenced "Form:"

> 1. Please read or show the following to the subject:
>
> You are hereby advised that a Detainer has been filed against you on May 9, 2012, (date) on the basis of Federal criminal charges filed against you in the U.S. District Court for the Southern District of West Virginia. With regard to answering these charges, you are hereby advised that you have the right to demand a speedy trial under . . . [IADA]. Under the IADA, you

have the right to be brought to trial within 180 days after you have caused to be delivered to the appropriate U.S. Attorney and the appropriate U.S. District Court, written notice of your request for a final disposition of the charges against you. Because the 180-day time limit may be tolled by virtue of delays attributable to you, you should periodically inquire as to whether your written notice of request for a final disposition of the charges against you has been received by the appropriate U.S. Attorney and the appropriate U.S. District Court. You are hereby advised that the 180-day time limit does not commence until your written notice of request for final disposition of the charges against you has actually been delivered to the appropriate U.S. Attorney and the appropriate U.S. District Court. If you have any questions regarding the provisions of the IADA, you should contact your attorney or the U. S. Attorney for the Southern District of West Virginia. . . .

2. Please execute the following:

    The foregoing was read to or by subject and a copy of the Detainer was delivered to him on (date).

Signed: _____ Title: _____

3. Please have the prisoner execute the following:

    "I have read or have been read the above paragraph notifying me that a Detainer has been lodged against me and that I have the right to demand speedy trial on the charge(s). I (do) (do not) demand a speedy trial on the charge(s). I understand that if I do request a speedy trial, this request will be delivered to the Office of the United States Attorney who caused the Detainer to be filed. I also understand that my right to a speedy trial under the IADA is the right to be brought to trial within 180 days after my written notice of request for a final disposition of the charge(s) against me has actually been delivered to the appropriate U.S. Attorney and the appropriate U.S. District Court. I further understand that the lS0-day time limit may be tolled by any delays attributable to me, and that I must periodically inquire as to whether my written notice of request for a final disposition of the charges against me has been

received by the appropriate U.S. Attorney and appropriate U.S. District Court. Finally, I understand that if at any time hereafter I desire to demand speedy trial and have not already done so, I can inform my custodian who will then cause the request to be forwarded to the appropriate U.S. Attorney."

_____     _____
Witness                     Signature of Prisoner and Date

                            _____
                            Typed or Printed Name of Prisoner

4. Please acknowledge receipt of this detainer. In addition, please provide one copy of the Detainer to the prisoner, return one copy of the Detainer to this office in the enclosed self-addressed envelope, and, if the prisoner demands a speedy trial, forward the Detainer together with the Certificate of Inmate Status by registered or certified mail to the U.S. Attorney for the Southern District of West Virginia and the U.S. District Court for the Southern District of West Virginia.

5. If the prisoner does not demand a speedy trial at this time and further elects to demand a speedy trial on the charge(s) at a later date, you should obtain a new set of this form from the United States Attorney's Office, have the prisoner complete the amended form, and follow the instructions contained in paragraph 4 above.

(Id. at 2).

          It is undisputed that Mr. Dailey neither completed the

Detainer nor provided it to the court or the United States

Attorney for this district.

          On May 15, 2012, the NERCF sent by registered mail,

return receipt requested, four other forms described below,

numbered I through IV.  The transmittal letter accompanying the

7

forms is addressed to the assigned Assistant United States
Attorney.  The letter indicates a courtesy copy was sent as well
to "Court Clerk, Southern District of West Virginia."  (Ex. C,
Def.'s Mot. to Dism. at 1).

        The return receipt attached to Mr. Dailey's motion,
and on which he relies, does reflect a mailing addressed to
"Court Clerk Southern District of West Virginia."  (Ex. D,
Def.'s Mot. to Dism. at 1).  The address used, however, shows
both the suite number (4000) and the post office box (1713) for
the United States Attorney's Office.  As reflected on the return
receipt, the mailing was signed for, and received, on May 21,
2012, by a staff member of the United States Attorney.  The
court record does not reflect receipt of the letter or the four
forms by the District Clerk.

        The NERCF transmittal letter itself merely notified
the United States Attorney that Mr. Dailey desired "to be
brought to trial" on the indictment in this matter.  Mr. Dailey
was copied on the transmittal letter, which included, as noted,
four different forms completed pursuant to the IADA.

        Form I is a "NOTICE OF UNTRIED INDICTMENT, INFORMATION
OR COMPLAINT AND OF RIGHT TO REQUEST DISPOSITION" apparently
given to Mr. Dailey while he was incarcerated as a result of his

8

probation revocation.  It consists of two pages.  It contains, inter alia, the following information:

> **RIGHT TO REQUEST DISPOSITION OF CHARGES AND TO SPEEDY TRIAL**
>
> **You are hereby further advised that under the IAD you have the right to request the appropriate prosecuting officer of the jurisdiction in which any such indictment. . . is pending, and the appropriate court, that a final disposition be made thereof.  You shall then be brought to trial within 180 days, unless extended pursuant to provisions of the IAD, after said prosecuting officer and said court have received written notice of the place of your imprisonment and your request, together with a certificate of the custodial authority as more fully set forth in the IAD. However, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.**

(Ex. C, Def.'s Sec. Mot. to Dism. at 2).  On May 14, 2012, Mr. Dailey signed Form I.

Form II is the "INMATE'S NOTICE OF PLACE OF IMPRISONMENT AND REQUEST FOR DISPOSITION OF INDICTMENTS, INFORMATIONS OR COMPLAINTS."  On May 14, 2012, Form II was also signed by Mr. Dailey.  It was directed to the United States Attorney in this district and reflects the defendant's request to be transported to this district for proceedings on the indictment.

Form III is styled "CERTIFICATION OF INMATE STATUS" and signed on May 15, 2012, by the NERCF Warden.  It reflects that Mr. Dailey was then serving a one to five year term

resulting from his probation revocation and additional sentence. Form III further reflected the "Time remaining to be served on the sentence" as being "Max date 11/26/14." Under the date of parole eligibility is written the word "Eligible."

Form IV is a brief "OFFER TO DELIVER CUSTODY" to the United States Attorney in this district signed by the NERCF warden. On June 14, 2012, defendant arrived in this district. He is presently incarcerated at the Southern Regional Jail.

On June 27, 2012, Mr. Dailey appeared before the Honorable Mary E. Stanley, United States Magistrate Judge, for an initial appearance, arraignment, and detention hearing. Trial was scheduled for August 27, 2012. Mr. Dailey was ordered detained. The magistrate judge observed, however, as follows: "The defendant does not contest detention at this time <u>but should he be paroled by the State of Vermont, a full detention hearing will commence forthwith</u>." (Ord. of Magis. Judge at 2 (S.D. W. Va. Jun. 27, 2012) (emphasis added)).

On July 20, 2012, Mr. Dailey moved to dismiss ("first motion to dismiss"). He asserted that the indictment did not charge an offense inasmuch as the section 2601 crime of lewd and lascivious conduct did not categorically equate to a "sex

offense" that would make him a "sex offender" and thus required
to register under SORNA.

The question presented involved application to SORNA
of the principles espoused in Taylor v. United States, 495 U.S.
575 (1990), and its progeny.  That is a question of first
impression in this circuit.  The only appellate court to
squarely confront the issue has ruled adversely to Mr. Dailey.
See United States v. Dodge, 597 F.3d 1347 (11th Cir. 2010)
(concluding that the modified categorical approach may be
applied in assessing predicate convictions for SORNA purposes).

On August 7, 2012, the court held a pretrial motions
hearing.  The court learned that the parties did not then have
in their possession certain documents associated with the
Vermont conviction, namely, the indictment, the plea agreement,
the plea hearing transcript, or the Judgment.  The court thus
deferred action on the motion, with the parties' agreement,
pending receipt of the missing documents and further
consultations between counsel respecting which of the papers
could be considered in the event that the court chose to apply
the modified categorical approach.

While Mr. Dailey's counsel did not object to
continuing the trial by a week, he noted his client's "prison

11

sentence in Vermont has been interrupted in that he has been taken out of prison and brought down to the regional jail, and he does have an interest in a prompt disposition of this matter." (Trans. of Aug. 7, 2012 Hrg. at 11). The court agreed, stating "in order to allow for this to develop, [we might have to] continue the trial for a week or two, but I'm not thinking of any lengthy period of time in that respect." (Id. at 11). Counsel were directed to advise the court when the documents were obtained and their mutual readiness to resume the hearing.

On August 16, 2012, Mr. Dailey filed a supplemental memorandum in support of his first motion to dismiss discussing the court of appeals' August 10, 2012, decision in United States v. Gomez, 690 F.3d 194 (4th Cir. 2012). The decision in Gomez involved the government's position at sentencing that a defendant's prior conviction for child abuse under Maryland law amounted to a crime of violence for purposes of a sentencing guideline enhancement. Two panel members in Gomez "join[ed] the majority of . . . sister circuits" and chose to "hold that the modified categorical approach applies only to those statutory offenses in which the statute itself is divisible." Id. at 200.

Illustrating the difficulty of the question presented, the decision was met with a pointed dissent:

> The majority, surprisingly, is unwilling to allow the use of the modified categorical approach to recognize Gomez's admission of violent conduct in pleading guilty to the . . . [predicate] charge . . . . The majority holds that as a condition of employing the modified categorical approach, the statute under consideration must itself be divided into 'categories' with some 'constituting a crime of violence and some not constituting a crime of violence.' . . . Unfortunately, the majority's opinion adopts an entirely new rule that (1) is not mandated by any Supreme Court decision; (2) is indeed inconsistent with a long line of Fourth Circuit cases, including cases cited approvingly by the Supreme Court; (3) is both impractical and illogical; and (4) aggravates a split among the circuits.

See id. at 203-04 (Niemeyer, J., dissenting).

On August 21, 2012, the United States responded to Mr. Dailey's supplemental memorandum, insisting that Gomez did not prescribe a strict categorical approach for SORNA offenses.  It further attached the documents obtained from Vermont respecting Mr. Dailey's predicate Vermont conviction for lewd and lascivious conduct.  In his August 22, 2012, reply brief, Mr. Dailey again urged that the rule in Gomez be applied in the SORNA context.

Having only received the Vermont documents three days earlier, and desiring to permit counsel to file additional briefing if they wished, the court convened a telephonic scheduling conference on August 24, 2012.  Counsel agreed to a rescheduled trial date of September 11, 2012.  The court noted

that its ruling on the first motion to dismiss "may be pivotal in this matter . . . ."  (Trans. of Aug. 24, 2012, Hrg. at 3).

During the teleconference, the United States was allowed an additional brief by August 29, 2012, with Mr. Dailey's response if he so desired coming after his review of the United States' filing.  No mention was made of Mr. Dailey's return to Vermont.  The court inquired when defense counsel was leaving his position with the Federal Public Defender's Office, which was pegged for September 21, 2012.  The court stated its intention at the time "to work within that period."  (<u>Id.</u> at 4).

On August 28, 2012, the United States filed its additional brief, again urging that the decision in <u>Dodge</u> be applied and the modified categorical approach used.  On August 29, 2012, Mr. Dailey submitted a supplemental authority letter referencing the decision two days earlier in <u>United States v. Beardsley</u>, 691 F.3d 252 (2nd Cir. 2012), which followed the approach in <u>Gomez</u> to a degree: "We therefore join the majority of our sister circuits in adopting a divisibility requirement for application of the modified categorical approach, <u>at least for purposes of § 2252A(b)(1)</u>."  <u>Id.</u> at 274 (emphasis added).

On August 31, 2012, the United States moved to continue the trial based upon the unavailability of its case

agent from September 10 to 12, 2013.  On September 5, 2012, Mr.
Dailey responded, stating in open-ended fashion that he had "no
objection to the United States' Motion to Continue Trial . . .
."  (Resp. to Mot. at 1).

On September 7, 2012, the court ordered the trial
continued until September 17, 2012, in a continuing effort to
bring the case to trial prior to defense counsel's departure.
Approximately one hour after the court continued the trial,
however, Mr. Dailey moved to continue based upon his lawyer's
obligations in other pending criminal matters in the district.
Mr. Dailey requested the court to "reschedule the trial of this
matter on a date convenient to the Court and the parties."
(Mot. at 2).  The United States responded to the motion that
same day, noting that the case agent would once again be
unavailable from September 17 through September 21, 2012.  It
requested that trial be set for September 24, 2012.

On September 10, 2012, the defendant replied to the
United States' response.  He asserted as follows:

> 1. This case has been assigned to undersigned counsel
> since the Office of the Federal Public Defender was
> appointed to represent the defendant. No other
> attorney in this office is familiar with the case.
>
> 2. [Another] Assistant Federal Public Defender . . .
> is on military leave, which is due to expire on
> September 21, 2012. As a result, and given the budget
> constraints of the Office of the Federal Public

Defender, undersigned counsel's retirement will go
into effect at the close of business on September 21.

3. Due to other court commitments, no other attorney
in the Office of the Federal Public Defender will be
available and prepared to try this case during the
week beginning September 24, 2012.

4. The defendant, Ronald Scott Dailey, is in federal
custody at the South Central Regional Jail under the
provisions of the Interstate Agreement on Detainers.
He would like to return to the Northeast Regional
Correctional Facility in Vermont, where he can resume
participating in the programs offered by that
institution.

WHEREFORE, the defendant respectfully requests that
the trial of this matter be scheduled to begin on
September 19, 2012.

(Mot. at 1-2).

That same day, the court conducted a telephonic status
conference.  It expressed to counsel once again its desire to
bring the case to trial prior to the September 21, 2012,
departure of the assigned Assistant Federal Public Defender.
The United States was thus directed to report back to the court
respecting whether it could yet obtain the participation of its
case agent so that the trial could be held and a discontinuity
of defense counsel avoided.  On September 11, 2012, the court
continued the trial to September 19, 2012, as requested by Mr.
Dailey.  A motions hearing was set for September 14, 2012.

On September 14, 2012, the court held the motions
hearing, which was attended by counsel and Mr. Dailey.  During

the hearing, the following colloquy occurred:

THE COURT: Thank you.

This matter was scheduled as a pretrial hearing for the trial in this matter scheduled for now next Wednesday. It's my understanding from communications that have been had by counsel with my deputy clerk, Ms. Miller, <u>that if the court denies the motion to dismiss, the parties have reached an accommodation for a conditional plea agreement</u>. Is that correct?

MR. WEIS: <u>That is correct, Your Honor</u>.

THE COURT: And that's your understanding as well, Ms. Johnston?

MS. JOHNSTON: <u>Yes, Your Honor</u>.

THE COURT: And so, it is apparent that <u>regardless of the court's ruling on the [first] motion to dismiss, there will not be a trial</u>.

(Trans. of Sept. 14, 2012 Hrg. at 2 (emphasis added); <u>see also</u> <u>id.</u> at 5 (noting without comment from counsel "that the parties have apparently by agreement eliminated the necessity for trial . . . .")).

The balance of the September 14, 2012, hearing was devoted to a detailed, further inquiry of counsel respecting certain of the Vermont documents at issue in the case in the event that the court resorted to the modified categorical approach. Perhaps contemplating that the court might possibly be leaning toward that analysis, which was contrary to what Mr. Dailey urged in the case, his counsel reminded the court of the August 29, 2012, supplemental authority letter citing the Second

17

Circuit <u>Beardsley</u> decision.  The court advised the parties that
it expected to enter its decision on the first motion to dismiss
the following week.

On September 19, 2012, however, -- during the week
that counsel was just days earlier advised to expect a ruling on
the first motion to dismiss -- Mr. Dailey's lawyer sent a letter
to the undersigned.  That correspondence, copied to the
Assistant United States Attorney and Mr. Dailey, stated as
follows:

> On August 31, 2012, the Supreme Court granted
> certiorari in <u>Matthew Robert Descamps, Petitioner v.</u>
> <u>United States</u>, No. 11-9540. In <u>United States v.</u>
> <u>Descamps</u>, 466 Fed. Appx. 563 (9th Cir. 2012), the
> defendant was convicted of violating a unitary
> California burglary statute which was broader than the
> definition of "burglary" used to determine if an
> offense is a violent felony for purposes of the Armed
> Career Criminal Act. The Ninth Circuit held that
> application of the modified categorical approach was
> proper. <u>Thus, the Court may resolve the conflict</u>
> <u>between the Ninth Circuit's approach and that set out</u>
> <u>in United States v. Gomez</u>, No. 12-4089 (4th Cir. filed
> August 10, 2012).

(Ltr. at 1 (emphasis added)).  The appeal in <u>Descamps</u> was
ultimately argued in the Supreme Court on January 7, 2013.  In
the absence of any other reasonable explanation, the letter was
perceived as an invitation to the court to belay its ruling and
await the decision in <u>Descamps</u>, which remains pending.

On September 24, 2012, another Assistant Federal
Public Defender was assigned to this action following the
departure from that office of Mr. Dailey's former counsel.  No
filings were made by substitute counsel from that date until
March 12, 2013.  To the court's knowledge, neither did counsel
nor Mr. Dailey contact chambers respecting a decision on the
first motion to dismiss.

On March 12, 2013, Mr. Dailey filed the second motion
to dismiss.  He asserts a violation of the Interstate Agreement
on Detainers Act, 18 U.S.C.A. App. 2 ("IADA").


II.


A.   Governing Standard


The IADA is "a Compact which has been adopted by the
federal government and virtually all the states."  5 Wayne R.
LaFave et al., Criminal Procedure § 18.4(c) (3d ed. 2012); see
also Alabama v. Bozeman, 533 U.S. 146, 149-50 (2001) ("The
United States joined in 1970. And Alabama is one of the 49 other
current members.")(citation omitted).  As noted in Bozeman,
Congress enacted the IADA in 1970.  It was designed, in part,

"to encourage the expeditious and orderly disposition of . . .
charges and determination of the proper status of any and all
detainers based on untried indictments . . . ."  IADA Art. 1.
Another purpose is to "encourage minimum interruption in
rehabilitative programs at the place of 'original imprisonment'
and to avoid harassment by uncoordinated shuttling of prisoners
back and forth between custodial states and other states in
which multiple related charges may be pending."  United States
v. Bryant, 612 F.2d 806, 809-10 (4th Cir. 1979).

Article III of the IADA governs the procedures and
time period applicable to an inmate seeking disposition of an
untried indictment pending against him in a jurisdiction other
than where he is incarcerated.  The Article III procedures are
invoked where, as here, a detainer has been lodged against the
extraterritorial inmate by a sovereign other than the one having
custody over him:

> Whenever a person has entered upon a term of
> imprisonment in a . . . correctional institution . .
> ., and . . . there is pending in any other . . . State
> any untried indictment . . . on the basis of which a
> detainer has been lodged against the prisoner, he
> shall be brought to trial within one hundred and
> eighty days after he shall have caused to be delivered
> to the prosecuting officer and the appropriate court
> of the prosecuting officer's jurisdiction written
> notice of the place of his imprisonment and his
> request for a final disposition to be made of the
> indictment . . . .: Provided, That, for good cause
> shown in open court, the prisoner or his counsel being
> present, the court having jurisdiction of the matter

may grant any necessary or reasonable continuance.
IAD Art. III(a).[2]

Moving to the instant dispute, the relief sought in the second motion to dismiss is foreclosed for at least two independent reasons.  The first arises out of Mr. Dailey's failure to deliver his request for final disposition in this district to both the court and the prosecutor.  The request was received only by the United States Attorney and, to the court's knowledge, never actually delivered by Mr. Dailey to the Clerk, the magistrate judge, or the undersigned or his staff.

---

[2]  The court notes that our court of appeals has not demanded strict compliance with the "open court" requirement found in the IADA.  See United States v. Odom, 674 F.2d 228, 231 (4th Cir. 1982) ("[W]e conclude that whether the judge presides in a courtroom or in chambers is immaterial if the defendant is represented by counsel.").
        Additionally, Article IV(c) of the IADA governs in those situations where the foreign charging jurisdiction requests temporary custody of the extraterritorial inmate for purposes of trying him on the pending charge.  See Alabama v. Bozeman, 533 U.S. 146, 150 (2001).  The time period applicable once that inmate arrives in the receiving jurisdiction is as follows:

> In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

IAD Art. IV(c).  In view of the Detainer, it appears this matter is more appropriately characterized as an Article III proceeding.

21

As the Supreme Court noted in **Fex v. Michigan**, 507 U.S. 43, (1993), Article III(a) gives rise to a bright-line rule:

> [T]he 180-day time period [in the IADA] does not commence until the prisoner's request for final disposition of the charges against him has actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him.

**Fex v. Michigan**, 507 U.S. 43, 51 (1993). This holding in **Fex** leaves little room for an accused desiring to excuse his failure to perfect delivery upon both the receiving court and the prosecutor. Mr. Dailey recognizes as much. In his reply brief coming after the United States asserted he did not return the speedy trial election form attached to the Detainer, he did not argue that his appearance in this district would wipe away any technical noncompliance with Article III(a). He instead insisted, albeit incorrectly, that he had perfected delivery of his request for disposition upon both the District Clerk and the United States Attorney. He nowhere suggests that delivery to one, but not the other, would suffice to trigger the 180-day period.

Mr. Dailey's lawyer does insist that his predecessor's oral statements to the court on August 7 and September 10, 2012, conveyed his client's wishes for a speedy disposition. Article III(a), however, explicitly contemplates a "written" request for

22

disposition.  The equivocal oral representations by the defense in this case illustrate the wisdom of the writing requirement.

Standing in stark contrast to the unambiguous dispositional demands for the accused's personal use that are found in the Detainer and Forms earlier described are the comparatively equivocal August 7 and September 10 oral statements by his former counsel.  First is the August 7, 2012, statement by Mr. Dailey's former lawyer that his client "does have an interest in a prompt disposition of this matter." (Trans. of Aug. 7, 2012, Hrg. at 11).  Second is the oral statement offered September 10, 2012, stating only that his client would "like to return to" the NERCF.  (Trans. of Sept. 10, 2012, Hrg. at 3).[3]

As noted in <u>Fex</u>, Article III(a) deals with, in essence, a limitations period.  A concrete accrual date is thus essential.  The writing required by Article III(a) offers a point certain, under the client's own witnessed signature, that

---

[3]     It is noted that the IADA permits the Vermont sentence to continue running while Mr. Dailey is present in this district. <u>See</u> Art. V(f) ("During the continuance of temporary custody or while the prisoner is otherwise being made available for trial as required by this agreement, time being served on the sentence shall continue to run but good time shall be earned by the prisoner only if, and to the extent that, the law and practice of the jurisdiction which imposed the sentence may allow."). Mr. Dailey does not assert that he has lost good time credit.

he is willing to stand trial in the foreign jurisdiction.  See
Fex, 507 U.S. at 49 ("It seems unlikely that a legislature would
select, for the starting point of a statute of limitations, a
concept so indeterminate as 'caused.' It makes more sense to
think that, as respondent contends, delivery is the key concept
. . . ."). Further, as Article III(a) plainly seems to
contemplate, the matter of his consent is best settled prior to
his arrival in the receiving jurisdiction.

It is noteworthy that the circuit courts of appeal
have rather consistently applied the unequivocal approach found
in Fex.  As the United States Court of Appeals for the Eighth
Circuit has observed, "even where a prisoner has made a good-
faith effort to invoke his rights under the IADA, he is not
entitled to relief unless adequate notice was actually
received."  United States v. Dooley, 580 F.3d 682, 685 (8th Cir.
2009)("The district court found that although Dooley mailed a
detainer form, he failed to indicate whether he was invoking his
rights under the IADA. Specifically, the item on the form
stating 'I(do) (do not) demand a speedy trial on the charge(s)'
was not marked."); see also United States v. Daily, 488 F.3d
796, 801 (8th Cir. 2007) (rejecting a prisoner's good-faith,
constructive delivery argument).

24

The United States Court of Appeals for the Tenth Circuit has applied the same strict rule.  In dealing with a defendant's argument that the United States Attorney should have forwarded his speedy trial request to the district court, thus satisfying the dual notification requirement of Article III(a), the following observation was made:

> While we are not unsympathetic to Mr. Washington's position, his argument is foreclosed by Fex. There, the Supreme Court specifically required actual delivery of a request to both the prosecutor and the court, and it refused to carve a "fairness" exception to the express language of the IAD in cases in which a third party had negligently or maliciously prevented delivery from occurring. Id. at 50-52, 113 S. Ct. 1085. Other circuits have followed Fex's clear instructions on this point. See, e.g., United States v. Dooley, 580 F.3d 682, 685 (8th Cir. 2009) (affirming the denial of a motion to dismiss the indictment based on the IAD, reasoning that "even where a prisoner has made a good-faith effort to invoke his rights under the [IAD], he is not entitled to relief unless adequate notice was actually received"); United States v. Daily, 488 F.3d 796, 797, 801 (8th Cir.2007) (same, in case where prison officials had refused to deliver prisoner's request under the IAD to any federal official at all); United States v. Brewington, 512 F.3d 995, 997 (7th Cir.2008) (affirming the denial of a motion to dismiss the indictment based on the IAD when state prison officials allegedly sent the speedy trial request only to the United States Attorney because "even if delivery of the notice is delayed due to negligence or malice on the part of prison authorities, the IAD's clock does not start running until the notice is actually received by both the prosecutor and the court"); United States v. Jones, 454 F.3d 642, 647-48 (7th Cir. 2006) (same, explaining that "[w]hile this may be a strict rule, the Supreme Court's decision in Fex explicitly contemplated a more egregious error on the part of the warden and found dismissal of the charges to be an inappropriate remedy"); United States

> <u>v. Johnson</u>, 196 F.3d 1000, 1002 (9th Cir. 1999)
> ("Under <u>Fex</u>, it does not matter what the prisoner may
> or may not have done in an attempt to cause such
> delivery. . . . Until actual delivery occurred, the
> 180-day period did not start to run."). Here, despite
> the fact that the USAO could have forwarded Mr.
> Washington's demand under the IAD to the district
> court, it did not do so. Because actual delivery was
> not accomplished with regard to both the court and the
> prosecutor, there was no violation of the IAD.

<u>U.S. v. Washington</u>, 596 F.3d 777, 781 (10th Cir. 2010).

Still other courts of appeal have reached the same result. <u>See</u>, <u>e.g</u>, <u>United States v. Paredes-Batista</u>, 140 F.3d 367, 374 (2nd Cir. 1998)")("Even if we were to accept <u>arguendo</u> that delivery of the request to the U.S. Marshals' office in the Southern District of New York in September 1994 was sufficient under a theory of agency to constitute delivery to the 'prosecuting officer' . . . the U.S. Attorney . . . , as Batista urges, that request did not become effective and start the 180-day clock until it was also delivered to the district court -- an event that did not occur until April 21, 1995."); <u>United States v. Henson</u>, 945 F.2d 430, 434 (1st Cir. 1991) (stating strict compliance with Article III is necessary to place prosecuting authority on notice that 180-day provision has been invoked); <u>see also</u> 35 C.J.S. <u>Extradition</u> § 105 (2013 elec.) ("The time period begins to run on the date that the prosecuting officer and appropriate court of the prosecuting officer's jurisdiction actually receive the prisoner's request for final

26

disposition, rather than on the date when the request should have been received, or the date that the prisoner sent the request, or delivered it to the prison warden.  An incomplete request does not trigger the time period for bringing the prisoner to trial.") (footnotes omitted).

Our court of appeals has held to the same effect in a recent unpublished disposition.  See United States v. Thomas, No. 08-5049, 2009 WL 2843584, at *1 (4th Cir. Sept. 3, 2009) ("Counsel . . . asserts that Thomas 'did everything within his power and control to make sure that his request for a speedy trial had been properly made.'  Nevertheless, Thomas failed to strictly comply with IADA procedures.  Moreover, any alleged negligence on the part of prison or law enforcement personnel does not excuse noncompliance with Article III.") (citation omitted).

As an aside, one is struck by the requirement that both the prosecutor and the court receive the required IADA notice requesting disposition.  Mr. Dailey would likely assert that notice to the United States Attorney here should suffice, inasmuch as that notice ultimately put the wheels in motion leading to his appearance in this district.  That observation, however, is immaterial under the IADA and Fex.  As noted in Brewington, "Prison authorities are charged with sending the

27

demand to the prosecutor and the court, but the prisoner bears responsibility for ensuring that his jailors follow through." _Brewington_, 512 F.3d at 997.  As further noted in _Brewington_, "this might be a good argument for rewriting the IAD, but it is beside the point because the IAD, as it presently reads, doesn't allow for that possibility."  _Brewington_, 512 F.3d at 997 (quoting the language in Fex, 507 U.S. at 52, to the effect that "'Petitioner's "fairness" and "higher purpose" arguments are, in other words, more appropriately addressed to the legislatures of the contracting States, which adopted the IAD's text.'").

Mr. Dailey's failure here to properly notify both the United States Attorney and the court is thus fatal to his IADA claim.  Simply put, the 180-day period never commenced running.

Apart from the defendant's failure to meet the IADA's requirement of written notice to the court in order to invoke the 180-day limit, a second bar to relief here arises from the (1) September 19, 2012, letter implicitly inviting the court to await the decision in _Descamps_, and (2) defense counsel, in his client's presence, notifying the court that the parties had arrived at a conditional plea agreement, making a trial unnecessary and, indeed, not possible.  As a consequence, the scheduled trial was mooted.

In <u>United States v. Odom</u>, 674 F.2d 228 (4th Cir. 1982), our court of appeals addressed a similar situation.  In <u>Odom</u>, following an earlier continuance that caused the trial to fall outside the time limit prescribed by the IADA, the defendant's attorney advised Odom that he might take advantage of the inordinate delay under the IADA and seek dismissal.  Odom, however, agreed to a plea bargain, from which he later withdrew and requested new counsel.  The new lawyer pursued the alleged IADA Article IV violation.  The district court dismissed the indictment.

The court of appeals reversed.  It is necessary to quote its analysis at length for context:

> We believe that three independent reasons justify reinstatement of the indictment. First, we conclude that Odom waived his right to be tried within 120 days. . . . [C]ourts uniformly have held that a defendant may waive the limitations imposed by the Act.

> Waiver has been found where, as here, the defendant was unaware of the Act's provision for a speedy trial. [C]ourts have reasoned that because the Detainer Act's guarantees are of statutory rather than constitutional proportions, a defendant need not know of the Act to effectively waive its provisions. Waiver is shown under these circumstances by proof that the defendant has affirmatively requested "to be treated in a manner contrary to the procedures prescribed by Article IV(c)."  <u>The same result has been reached by holding that a defendant is estopped from invoking the Act when he has requested a procedure inconsistent with its provisions</u>.

Applying these principles, we conclude that Odom waived his statutory right to be brought to trial in 120 days. He was aware that his counsel would seek a continuance. The consequent delay was for good cause and, indeed, in Odom's best interest. <u>Moreover, even after Odom was told of the Act's limitation, he undertook a course of action inconsistent with the Act by bargaining for a plea</u>.

<u>Odom</u>, 674 F.2d at 230 (emphasis added) (citations and footnote omitted).[4]

As in <u>Odom</u>, Mr. Dailey has pursued a course of action inconsistent with the 180-day trial limit prescribed by the IADA.  First, on September 14, 2012, counsel informed the court, in the defendant's presence, that a trial would be unnecessary inasmuch as a conditional plea agreement had been reached dependent upon the court's disposition of the first motion to dismiss.  The court had, to that point, contemplated an August, and then a September trial date, to avoid a discontinuity of counsel.  The court went so far as to suggest to the United

---

[4]    It is noted that the earlier-referenced Form III lists Mr. Dailey as parole eligible for the Vermont offense.  Until disclosed in his second motion to dismiss, however, it does not appear that anyone in this district was informed that Mr. Dailey "will not actually receive consideration for parole until the conclusion of this matter."  (Memo. in Supp. of Mot. to Dism. at 9).  In fact, as noted earlier, Mr. Dailey stood silent while the opposite impression formed.  (Ord. of Magis. Judge at 2 (S.D. W. Va. Jun. 27, 2012) (stating "The defendant does not contest detention at this time <u>but should he be paroled by the State of Vermont, a full detention hearing will commence forthwith</u>.") (emphasis added)).  He cannot now claim prejudice arising therefrom.

States that it undertake determined efforts to secure the presence of its case agent despite his unavailability in light of scheduled training.

Second, following the announcement that a conditional plea agreement had been reached, Mr. Dailey's lawyer, copying his client and the Assistant United States Attorney, appeared to abandon the previously held desire for a prompt disposition. He noted therein the grant of certiorari in Descamps, seeming to suggest that the court stay its hand. He did so in the apparent hope that the Supreme Court might "resolve the conflict between the Ninth Circuit's approach [modified categorical analysis] and that set out in" the court of appeals' majority decision in Gomez.

The timing of the letter is especially significant. It was sent just three business days after the court informed the parties at the September 14, 2012, hearing that it expected to render a decision on the first motion to dismiss the very next week.[5] Additionally, it was during the September 14, 2012,

_____

[5]     In Odom, the court of appeals also observed "delay that is lawful under the Speedy Trial Act generally will comply with the mandate of the" IADA. Odom, 674 F.2d at 231; see also United States v. Hines, 717 F.2d 1481, 1486 (4th Cir. 1983) (noting the decision in Odom "held that the periods excluded under the Speedy Trial Act . . . (e.g., period from filing to disposition
                                                                    (continued)

hearing that the court questioned counsel in depth about certain Vermont documents that might be consulted if the modified categorical approach were used in addressing Mr. Dailey's first motion to dismiss.  Perhaps concerned that the court might carve out an exception to Gomez for SORNA offenses, it appears Mr. Dailey's lawyer may have desired an authoritative determination from the Supreme Court in Descamps and a final and favorable outcome for his client without the necessity of an appeal by either side.

These two circumstances, agreeing to a conditional plea and inviting the court to hold the first motion to dismiss in abeyance, are properly treated as estopping Mr. Dailey from invoking the IADA 180-day trial time limit.  See also New York v. Hill, 528 U.S. 110, 118 (2000) (declining a proposed construction of the IADA that "would enable defendants to escape justice by willingly accepting treatment inconsistent

_____

of pretrial motion) likewise should be excluded under the IAD."). But see New York v. Hill, 528 U.S. 110 (2000) (noting some features of the Speedy Trial Act make analogies to the IADA "inapt").

The suggestion found in the September 19, 2012, letter thus serves an additional purpose.  Mr. Dailey's former lawyer invited the court to hold its imminent ruling in abeyance awaiting the outcome in Descamps.  As such, the period between the receipt of the letter and the forthcoming decision in Descamps would constitute excludible time under both section 3161(h)(1)(D) of the Speedy Trial Act and the "good cause" provision of IADA Article III(a).

with the IAD's time limits, and then recanting later on.");

<u>United States v. Hines</u>, 717 F.2d 1481, 1487 (4th Cir. 1983)

("Jackson sought to benefit from the pretrial motions which

necessarily resulted in delays, and cannot now claim that he is

aggrieved under the IAD by those delays."); <u>United States v.</u>

<u>Oldaker</u>, 823 F.2d 778, 780-81 (4th Cir. 1987) ("As the Fifth

Circuit said . . . , a prisoner 'cannot by his own action

manufacture a violation of the [IAD] and then seek relief under

it.'") (quoting <u>United States v. Boggs</u>, 612 F.2d 991, 993 (5th

Cir. 1980)).

          Based upon the foregoing discussion, it is ORDERED

that Mr. Dailey's second motion to dismiss be, and hereby is,

denied.  The court expects to enter its disposition of the first

motion to dismiss with dispatch following the decision in

<u>Descamps</u>.

          The Clerk is directed to forward copies of this

written opinion and order to the defendant, all counsel of

record, the United States Probation Department and the United

States Marshal.

                              DATED: April 9, 2013

                              John T. Copenhaver, Jr.
                              United States District Judge